UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| UNITED STATES OF AMERICA, | Case No. 08-CR-0010 (PJS/FLN) |
|---|---|
| Plaintiff, | |
| v. | ORDER ON OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT |
| FRANCIS LEROY MCLAIN, | |
| Defendant. | |

Michael L. Cheever and David M. Genrich, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Frances Leroy McLain, defendant pro se. (Rick E. Mattox, MATTOX LAW OFFICE, standby counsel.)

During the time period relevant to this action, defendant Francis Leroy McLain owned and operated a business — a business that was run under various names, including "Kind Hearts" and "Kirpal Nurses, LLC" (collectively "Kirpal") — that supplied temporary nursing staff to nursing homes and other healthcare facilities. McLain was convicted under 26 U.S.C. § 7202 of nine counts of failing to account for and pay over Federal Income Contribution Act ("FICA") and income taxes (collectively, "employment taxes") on Kirpal employees.

This matter is before the Court on the parties' objections to the Presentence Investigation Report ("PSR"). The Court held a hearing on April 23, 2009 to address these objections. The Court ruled on most of the objections at the hearing, but took under advisement the issue of the amount from the Tax Table (U.S.S.G. § 2T4.1) that "correspond[s] to the tax not collected or accounted for and paid over" under § 2T1.6(a) of the Guidelines. For simplicity's sake, the Court will refer to this amount as the "tax loss," even though, as the Court explained at the hearing, § 2T1.6(a) does not require an actual loss of tax revenues.

According to the PSR, the amount of the tax loss is $826,795.89, which corresponds to a base offense level of 20.[1] PSR ¶ 21. Both the government and McLain object to this amount. McLain objects that this amount is based on the amount that he allegedly failed to account for and pay over on the temporary nursing staff that Kirpal supplied to nursing homes and other healthcare facilities. According to McLain, these nurses were all independent contractors rather than employees, and thus Kirpal was not required to account for or pay over employment taxes on them.[2]

This argument was pressed with vigor by McLain at trial, but we cannot know what the jury thought of the argument. The government tried the case on the theory that McLain unlawfully failed to account for and pay over taxes on two categories of employees: office staff and nursing staff. The jury's general verdict of "guilty" on each count could mean that the jury found that McLain acted unlawfully with respect to only the office staff, with respect to only the nursing staff, or with respect to both the office staff and the nursing staff. Thus the Court cannot rely on the jury verdict in resolving McLain's contention regarding the status of the nursing staff.

---

[1] The government agrees that the precise amount stated in the PSR is overstated by roughly $350. *Compare* PSR ¶ 12 (stating that the total tax loss for federal income-tax withholding for nursing staff was $327,763.29) *with* Docket No. 183 at 3 (stating that the total tax loss for federal income-tax withholding for nursing staff was $327,414.93). This overstatement does not affect the Guidelines calculation.

[2] In addition to his factual objection concerning the employment status of the nursing staff, McLain raised several legal objections to the amount of the tax loss, which the Court overruled at the hearing on April 23, 2009. The Court's explanation for its actions can be found in the transcript of the hearing.

For its part, the government objects to the PSR's failure to include amounts attributable to various other tax schemes of McLain's that, the government argues, constitute "relevant conduct" under § 1B1.3 of the Guidelines. The government also objects to the PSR's failure to include the amounts that McLain allegedly failed to account for and pay over on Kirpal's office staff. If these amounts were included, the amount of the loss would be over $1 million but less than $2.5 million, which corresponds to a base offense level of 22.

*A. McLain's Objection*

McLain's objection regarding the status of the nursing staff is far from frivolous, but the Court nevertheless concludes, by a preponderance of the evidence, that the nurses who worked for Kirpal were employees of Kirpal rather than independent contractors. Under the applicable regulations, an employment relationship generally exists when the employer has the right to control the worker both as to the result to be accomplished and as to how the work is to be performed. 26 C.F.R. §§ 31.3401(c)-1(b), 31.3121(d)-1(c)(2). The regulations also provide that, if the requisite degree of control is present, the parties' attempt to designate their relationship as anything other than that of employer and employee is irrelevant. *See* 26 C.F.R. §§ 31.3401(c)-1(e), 31.3121(d)-1(a)(3).

The Internal Revenue Service has developed a detailed list of factors to consider in determining whether sufficient control is present to establish an employment relationship. These factors include whether the worker is required to comply with instructions about when, where, and how to perform the work; whether the worker receives training from the employer; whether the employer's business depends on the performance of the worker's services; whether the services must be rendered personally by the worker; whether the worker has a continuing

relationship with the employer; whether the worker has set hours of work; whether the worker is required to work full-time; whether the worker works on the employer's premises; whether the worker has a set order of tasks; whether the worker provides regular oral or written reports to the employer; whether the worker is paid by the hour or by the task; whether the worker has the right to terminate her relationship with the employer without incurring liability; whether the worker has the right to hire, supervise, and pay assistants; whether the worker pays her own business expenses; whether the worker furnishes her own tools; whether the worker has a significant investment in her business operations; whether the worker can realize a profit or loss from her work; whether the worker can be discharged without cause; whether the worker has the right to work for more than one firm at a time; and whether the worker has the right to make her services available to the general public. Rev. Rul. 87-41, 1987-1 C.B. 296.

Although a few of the factors, viewed in isolation, weigh in favor of a finding that Kirpal's nursing staffers were independent contractors, the factors considered as a whole compel the conclusion that the staffers were employees. The evidence at trial demonstrated that the staffers turned in timesheets to Kirpal and were paid by the hour (at least for shifts of up to eight hours). Thus, the staffers did not realize a profit or loss from their work. Kirpal took responsibility for ensuring that the staffers performed their temporary assignments just as though they were employees of the particular nursing home. Kirpal also took responsibility for ensuring that the staffers were properly licensed and trained. Kirpal employed a registered nurse to assess and train the nursing staff and sometimes provided on-site supervision of its nursing staff. The staffers did not employ their own assistants, but were expected to work with the existing staff at the nursing home. Kirpal office personnel fielded complaints from nursing homes and would

inform staffers of the need to improve their conduct or performance. Kirpal also periodically evaluated its nursing staffers to ensure that they were performing their duties properly. Although staffers could decline shifts, once they accepted a shift they were expected to show up on time and work the entire shift. The staffers had a continuing relationship with Kirpal and were obviously an integral part of Kirpal's business. Although the staffers provided some minor equipment, it was de minimis when compared to the equipment provided at the nursing homes. Kirpal also required staffers to wear uniforms and meet certain personal-hygiene standards. Staffers could quit without incurring any liability, and Kirpal was free to terminate them with or without cause. Finally, it is worth noting that, in at least some contracts with healthcare facilities, Kirpal agreed that the staffers were Kirpal employees and that Kirpal would be responsible for withholding employment taxes. *See, e.g.*, Gov't Trial Ex. 176 at 1.

Based on these factors, the Court concludes, by a preponderance of the evidence, that the Kirpal nursing staffers were employees rather than independent contractors. The Court therefore overrules McLain's objection and finds that the amount of "tax loss" under § 2T1.6(a) includes the $826,447.53 in employment taxes not accounted for and paid over with respect to the Kirpal nursing staff. *See* Gov't Trial Ex. 104 (documenting $579,031.23 in unpaid employment taxes on Kirpal nursing staff, not including the $251,616.30 for the employer's share of FICA taxes); PSR ¶ 12 (giving McLain credit for $4,200 in employment taxes paid in 2002).

### B. The Government's Objection

The tax loss stated in the PSR includes only the amounts that McLain failed to account for and pay over with respect to Kirpal's nursing staff. The government objects to the failure to include the following amounts: (1) $53,655.43 in tax losses attributable to the employment taxes

allegedly not accounted for and paid over on Kirpal office workers; (2) $207,511.67 in tax deductions that McLain allegedly gave to Brad Hall, a business associate; (3) $2,800 in tax deductions that McLain allegedly gave to Daniel Shetka, a Kirpal office worker; (4) $30,800 in tax deductions that McLain allegedly gave to Larry McCormick, another business associate; and (5) $93,991.19 in personal income taxes that McLain allegedly failed to pay for the years 2000 to 2004.

### 1. Office Workers

At trial, the government presented evidence of amounts that McLain failed to account for and pay over with respect to Kirpal's office workers. *See* Gov't Trial Ex. 118. This is clearly relevant conduct under § 1B1.3(a)(1) of the Guidelines; indeed, it was charged in the indictment and considered by the jury. There is no question that the office workers were employees of Kirpal; McLain made no real effort to contest the issue at trial. Finally, McLain offers no factual objection to the amount of employment taxes calculated by the government. The Court therefore includes the $53,655.43 in employment taxes associated with the office employees in the amount of the loss. *See* Gov't Trial Ex. 118.

### 2. Tax Deductions

At trial, the government presented evidence that, on several occasions, McLain purported to give tax deductions to people who were not entitled to take them. For example, McLain and Brad Hall co-signed a mortgage on a ranch in Montana. There is ample evidence that McLain made all the mortgage payments, *see* Gov't Trial Ex. 164 at 2-3, 5, yet McLain struck a deal with Hall in which McLain permitted Hall to take tax deductions on the mortgage interest (and on miscellaneous other payments, such as charitable contributions that Hall did not make), *see id.* at

1, 3; Gov't Trial Ex. 40 at 1-2, 3. This arrangement lasted for about ten years, from 1995 through 2004. Gov't Trial Ex. 164 at 3.

Similarly, in December 2004 McLain sent a letter — purportedly on behalf of a company called "California Intelligent Communities" — to Daniel Shetka, a Kirpal employee, stating that the stock Shetka had purchased in the company was worthless and that Shetka could write off his $10,000 investment. Gov't Trial Ex. 156-1. But Shetka credibly testified that he had never *heard* of "California Intelligent Communities," much less invested $10,000 in the company, and thus was obviously not entitled to any such deduction.

Finally, the government presented a document entitled "Proposal to Larry McCormick" which was found at McLain's residence and which outlines various tax deductions that the author proposes to give to McCormick. Gov't Trial Ex. 159.

The government argues that these "gifts" of tax deductions to Hall, Shetka, and McCormick constitute the crime of willfully aiding, assisting, procuring, counseling, or advising the preparation or presentation of a materially false or fraudulent tax return under 26 U.S.C. § 7206(2). McLain disagrees, arguing that the government has not proven that Hall, Shetka, or McCormick ever filed a false or fraudulent tax return — that is, a tax return on which they claimed these "gifted" deductions.

McLain's factual premise is correct — the government did not prove that Hall, Shetka, or McCormick ever filed a tax return taking the deductions — but courts have split over whether filing is an element under § 7206(2), as McLain assumes. *Compare United States v. Dahlstrom*, 713 F.2d 1423, 1428-29 (9th Cir. 1983) (adopting filing requirement) *with United States v. Feaster*, 843 F.2d 1392, at *2 (6th Cir. 1988) (unpublished table decision) (rejecting filing

requirement as contrary to the plain language of the statute) *and United States v. Borden*, 269 Fed. Appx. 903, 904-05 (11th Cir. Mar. 13, 2008) (per curiam) (same). The Court agrees with those courts that have held that, under the plain language of the statute, proof of filing is not required. The statute clearly prohibits counseling *either* the preparation *or* the presentation of a false or fraudulent return. *See* 26 U.S.C. § 7206(2) (imposing criminal penalties on any person who "[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under . . . the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter"). McLain clearly counseled both Hall and Shetka to *prepare* false or fraudulent tax returns, and proof that Hall or Shetka went further and *presented* (i.e., filed) those returns is not required.

With respect to the McCormick proposal, however, the Court concludes that the evidence — a single-page, unsigned document containing a bulleted list — is too speculative to support the inclusion of additional tax losses. While the evidence introduced at trial permits the Court to find, by a preponderance of the evidence, that McLain counseled Shetka and Hall to prepare fraudulent returns, the trial evidence does not permit the Court to find that McLain ever communicated the McCormick proposal to any person or otherwise attempted to put it into effect. The Court will therefore overrule the government's objection to the extent that it calls for the inclusion of tax losses attributed to the McCormick proposal.

McLain next argues that these tax-deduction schemes have nothing to do with the conduct charged in the indictment. But for purposes of calculating a defendant's offense level under the Guidelines, a court considers the defendant's "relevant conduct," which is not limited to the conduct underlying the defendant's conviction. *See United States v. Boesen*, 541 F.3d

-8-

838, 851 (8th Cir. 2008) (relevant conduct need not be charged in the indictment to be considered in sentencing).³ Under § 1B1.3(a)(2) of the Guidelines, "relevant conduct" includes conduct (1) for which § 3D1.2(d) would require a grouping of multiple counts and (2) that was "part of the same course of conduct or common scheme or plan as the offense of conviction."

There is no question that, had McLain been charged with and convicted of violating § 7206(2) on the basis of his tax-deduction schemes, § 3D1.2(d) of the Guidelines would require grouping those offenses with his other tax offenses. Section 3D1.2(d) requires grouping "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss," and specifically requires grouping of tax offenses, including offenses under 26 U.S.C. § 7202 and 26 U.S.C. § 7206(2). Thus, McLain's tax-deduction schemes are properly included in calculating the tax loss as long as they were part of the "same course of conduct or common scheme or plan" as his crimes of conviction.

---

³McLain argues that consideration of his uncharged conduct impermissibly amends the indictment. This argument betrays a misunderstanding of the role that the Sentencing Guidelines play in determining a defendant's sentence. As the Court explained to McLain during trial, § 7202 authorizes a maximum sentence of five years for each conviction. The facts necessary to convict McLain of nine violations of § 7202 were charged in the indictment and presented to a jury, which found him guilty of all nine charges. Thus, the jury's verdict gives the Court the authority to impose a sentence of up to five years per conviction before the Guidelines even come into play.

After a defendant has been convicted of a crime, federal courts turn to the Guidelines for guidance in determining an appropriate sentence within the range already authorized by law. The Guidelines produce a nonbinding, advisory sentencing range by taking into consideration a great deal of information about the defendant's background and the circumstances surrounding the commission of his offense. Because the Guidelines simply help inform the Court's choice of a sentence within the range already authorized by law, the information on which the Guidelines range is based need not be charged in the indictment and proven at trial. Thus, McLain's argument that the Court's consideration of "relevant conduct" under the Guidelines is a constructive amendment of the indictment is incorrect. McLain is not being convicted of or sentenced for any crime other than the crimes charged in the indictment.

For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. U.S.S.G. § 1B1.3, application note 9. "Common scheme or plan" is construed broadly in determining what constitutes relevant conduct. *United States v. Killgo*, 397 F.3d 628, 631 (8th Cir. 2005).

Here, the evidence at trial left no doubt that McLain has, for years, devoted an extraordinary amount of time and effort to the single purpose of evading taxes. Indeed, it would not be an exaggeration to state that, to a substantial extent, McLain has organized his life around this goal. McLain's "gifts" of tax deductions were, of course, clearly related to his avocation of cheating on his taxes. McLain's business and personal activities generated legitimate tax deductions, but because McLain was so successful at evading his taxes by other (often unlawful) means, he had no need to take the deductions. Rather than letting the deductions go to waste, he used them as currency in a final effort to wring as much profit as possible from his tax-evasion scheme.

All of these tax-deduction offenses overlapped in time with McLain's offenses of conviction and were part of McLain's overall tax-evasion scheme. *See Killgo*, 397 F.3d at 631 (courts consider temporal proximity of the conduct in determining whether it is part of the same course of conduct or common scheme or plan). The Court therefore concludes that the Hall and Shetka tax-deduction schemes were part of the same common scheme or plan as his offenses of conviction and are thus "relevant conduct" that should be considered under § 1B1.3. *Cf.* U.S.S.G. § 2T1.1, application note 2 (all conduct violating the tax laws should be considered as

part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated).

Finally, McLain argues that the government must prove that his tax-deduction schemes resulted in actual tax losses. The Court disagrees. Section 2T1.4 of the Guidelines, which is applicable to offenses under § 7206(2), refers to § 2T.1.1(c) for "the general principles underlying the determination of tax loss . . . ." *See* U.S.S.G. § 2T1.4, application note 1. Under § 2T1.1(c)(1), the government need not prove an actual tax loss; instead, the tax loss is "the loss that *would* have resulted *had* the offense been successfully completed." (Emphasis added.) Obviously, § 2T1.1(c)(1) does not require that the offense *be* successfully completed.

In calculating the total tax loss, the Court will therefore include the $207,511.67 in tax losses attributable to the Brad Hall tax deductions and $2,800.00 in tax losses attributable to the Daniel Shetka tax deduction. *See* Gov't Trial Exs. 164 at 3 (listing deductions totaling $741,113.12 given to Brad Hall), 156-1 (offering $10,000 deduction to Daniel Shetka); U.S.S.G. § 2T1.1(c)(1)(C) (applying a .28% multiplier to determine tax losses from improper deductions).

3. Income Taxes

There is no dispute that McLain filed no personal income tax returns for the years 2000 through 2004. *See* Gov't Trial Exs. 78, 80. During those same years, McLain made $469,955.96 in interest payments on his Montana ranch. *See* Gov't Trial Ex. 164 at 3 (listing deductions given to Brad Hall for the years 2000 through 2004; the deductions for 2000 through 2002 represent 75% of the interest paid for those years). The government argues, and the Court agrees, that the interest payments for those years represent an extremely conservative estimate of McLain's income for those years. McLain's income was almost certainly much greater. *See*

-11-

Gov't Trial Ex. 164 at 2 (McLain's statement that he "had been earning over $250,000 per year for the previous three years" at the time he applied for the mortgage on the Montana ranch).

As discussed earlier, McLain's tax-evasion activities constitute a common scheme or plan, and his failure to pay income taxes during the years in which he was committing his other tax-evasion offenses was part and parcel of that scheme. The Court therefore concludes that it is proper, under § 1B1.3, to include in the tax loss McLain's unpaid income taxes for the years 2000 through 2004 in the amount of $93,991.19. *See* U.S.S.G. § 2T1.1(c)(2)(A) (applying a .20% multiplier to determine tax losses from failure to file a tax return). The Court emphasizes that this is a *very* conservative estimate of the tax losses caused by McLain's failure to pay income taxes.

### C. Conclusion

The Court overrules McLain's objection and finds, by a preponderance of the evidence, that the nursing professionals who worked for Kirpal were employees of Kirpal. The Court sustains the government's objections — with the exception of the objection pertaining to the "Proposal to Larry McCormick" — and finds that the total tax loss in this case is no less than $1,184,405.82, which yields an offense level of 22. *See* U.S.S.G. § 2T4.1(I).

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant Francis Leroy McLain's objection to the inclusion of the tax losses attributable to defendant's failure to pay employment taxes on Kirpal nursing staff is OVERRULED.

2. The government's objection to the failure to include tax losses attributable to deductions that defendant gave to Brad Hall and Daniel Shetka is SUSTAINED.

3. The government's objection to the failure to include tax losses attributable to defendant's failure to pay personal income taxes during the years 2000 through 2004 is SUSTAINED.

4. The government's objection to the failure to include tax losses reflected on the document entitled "Proposal to Larry McCormick" is OVERRULED.

5. The Court finds, by a preponderance of the evidence, that the total tax loss in this case is at least $1,184,405.82, which yields an offense level of 22.

Dated: July 20, 2009                    s/Patrick J. Schiltz
                                        Patrick J. Schiltz
                                        United States District Judge